## Case No. 7,912.

### KNOX v. The NINETTA.

[Crabbe, 534, 5 Pa. Law J. 33.] [1]

District Court, E. D. Pennsylvania. May Term, 1844.

CARRIERS—DAMAGES — AGREEMENT NOT TO TAKE OTHER CARGO—GRAIN DAMAGED—LOSS OF MARITIME LIEN—MADE ANOTHER VOYAGE—USAGE OF TRADE — CARRIER AS INSURER — RIGHT TO FREIGHT.

1. A citizen of another state filed in this court his libel in rem, founded on a breach of maritime contract and depending on the general maritime law; subsequently to the alleged breach, and before the libel was filed, the vessel had made a voyage, but the libellant's lien was not divested thereby.

2. Grain was shipped on board the Ninetta, on condition that no other cargo should be taken, and that it should be carried directly to Philadelphia, without deviation; the master deviated and took additional cargo, whereby, it was alleged, the grain was damaged: this was such a case of violation of maritime contract as to give admiralty courts of the United States jurisdiction in rem therein.

3. A bill of lading in the usual form is a mere receipt for goods, and contains no stipula-

¹ [Reported by William H. Crabbe, Esq.: 5 Pa. Law J. 33, contains only a partial report.]

tion or liability to which the master would not be subject by the general maritime law, but the burden of proof of any other contract or agreement is on the party alleging it.

[Cited in The Wellington, Case No. 17,384.]

4. A usage or custom of trade may always be waived by, and cannot vary, a positive stipulation.

[Cited in Randall v. Smith, 63 Me. 107.]

5. The master of a vessel who violates a contract not to take additional cargo assumes the risk and responsibility of an insurer, and is liable for any loss which may afterwards occur.

[Cited in brief in Daniels v. Ballentine, 23 Ohio St. 535.]

6. The violation of a maritime contract by the master of a vessel does not forfeit his right to freight, but founds a distinct claim for damages.

[Cited in Lowry v. The E. Benjamin, Case No. 8,582.]

This was a libel for damages arising from breach of contract.

The libel alleged that in October, 1842, the libellant [Thomas F. Knox] shipped on board the Ninetta, then in the Rappahannock, in the state of Virginia, upwards of four thousand bushels of wheat, consigned to one Soutter, in Philadelphia, on which freight was to be paid at the rate of four cents per bushel, and that in consideration thereof, Baymore, the master of the Ninetta, agreed to take no other cargo, and to make the voyage to Philadelphia directly and without deviation; but that the said Baymore, in violation of the said agreement, deviated from his course, and went into the river Piankitank, in Virginia, and there took in an additional cargo or deck load of wood, and also deviated and went into Norfolk, in Virginia, by reason whereof the vessel sprung aleak and the wheat was damaged. The respondent filed a plea to the jurisdiction; alleging that the contract was not such as to be within the cognizance of this court in case of its violation, and that even if the contract was within the jurisdiction, the lien was destroyed by reason of the vessel having made a voyage since the alleged breach took place.

G. M. Wharton, for respondent.

On the cause of action, as set forth in the libel, there is no specific lien on the vessel. Thompson v. Lyle, 3 Watts & S. 166, citing Swaim v. The Franklin [Case No. 13,660], decided by Judge Hopkinson; Davis v. New Brig [Id. 3,643]; Bains v. The James & Catherine [Id. 756].

Mr. Dunlap, for libellant.

A maritime contract undoubtedly exists here, and the authorities give this court jurisdiction in such a case. De Lovio v. Boit [Id. 3,776]; The Rebecca [Id. 11,619]; Dunl. Adm. Pr. 49, 52; The Jerusalem [Case No. 7,294]; McGrath v. Candelero [Id. 8,810].

G. M. Wharton, for respondent, in reply.

The only case of binding authority on this court among those cited, is Swaim v. The Franklin [supra], but the weight of authority, even on the other cases, is with the respondent. The case of The Franklin, however, is

identically the same question. It is unimportant what jurisdiction the general admiralty law would give; this court has only the admiralty jurisdiction exercised in England before our Revolution. Ramsay v. Allegre, 12 Wheat. [25 U. S.] 611; The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175; The Thomas Jefferson, 10 Wheat. [23 U. S.] 428; Malpica v. McKown, 1 La. 249; Arayo v. Currel, Id. 529.

On the 19th of January, 1844, RANDALL, District Judge, delivered the following opinion on the question of jurisdiction.

This is a libel for the damage suffered by an invoice of wheat, consisting of over four thousand bushels, shipped by the libellant on board the Ninetta, in October, 1842, and consigned to Philadelphia; this shipment being made under an agreement that no other freight should be taken, and that the voyage to Philadelphia should be made without deviation. The master of the Ninetta deviated from his course, however, and took additional cargo, and the wheat was damaged on the voyage. When she arrived at Philadelphia, the consignee received the wheat, and, after remaining more than ten days in port, she sailed on another voyage, on returning from which she was proceeded against by this libel. A plea has been put in to the jurisdiction, resting on two grounds: First, that the libellant's lien, if it ever existed, has been lost by reason of the subsequent voyage; and, second, that the breach of contract complained of is not a case within the jurisdiction of this court.

If this were a proceeding, under the state law, for materials or repairs furnished to the vessel for her outfit, the first ground of objection to the jurisdiction would be a good one, as the statute expressly limits the lien to the time when the vessel first proceeds to sea. But if the libellant have a lien at all, it is under the general admiralty law, and is not extinguished by the delay; more especially as the same parties who now own the vessel did so when the injury was sustained.

In the case of The Rebecca [Case No. 11,-619], which was a libel for damages similar to this one, the vessel had made several voyages, and had been twice sold before the libel was filed, and was then owned by a third person, but the court held that, unless there was gross negligence on the part of the libellant, the vessel remained liable in the hands of the purchaser. So in the case of The Mary [Id. 9,186], which was a libel for seaman's wages. The crew had been discharged at New Orleans, in August, 1819; in October following, the ship was sold to a bona fide purchaser, and sent on a voyage to Liverpool and New York, at which last port she arrived in July, 1820, and was then libelled for the wages due to the men at New Orleans. It was in evidence that they had threatened to libel the vessel at New Orleans, but forbore to do so on the promise of the captain to pay them at

New York. The court held that this amounted to nothing more than a forbearance on the part of the libellants to libel at that time, but not to a waiver of any remedy they might have if they were not paid by the captain; and the decree of the district court sustaining the libel was affirmed. Numerous other authorities might be adduced to the same point, but these are deemed sufficient.

The other objection is one of more difficulty, and has not, I think, been formally decided in this district. In how many of the other districts the question has arisen I am unable to say, for, since the publication of Mr. Peters' collection, with the exception of the districts in the First and Second circuits, very few decisions of the courts of admiralty have been published. I have been unable to find more than two cases in print in which the direct question has been decided. The first of these is that of The Rebecca. [supra]. In that case the libellants had shipped at New York ten hogsheads of spirits, to be safely delivered at Portland, the dangers of the sea only excepted, and alleged that in consequence of careless and improper stowage they had been lost, and prayed process against the vessel, &c., for the damage. The claimants denied the liability of the vessel, under any circumstances, to answer the libellant's demand. After hearing the argument of counsel, a very able and elaborate opinion was delivered by Judge Ware, in which he reviewed the various authorities bearing on the question, and concluded by affirming the liability of the vessel to answer the claim, and the jurisdiction of the court to enforce it. The other case is that of House v. The Lexington [Case No. 6,767a], decided in January, 1843. In that case, the libellant had shipped on board the Lexington, at Philadelphia, a quantity of clover seed, to be delivered in New York, but not being able to obtain a full freight for his vessel, the captain sent the seed by the transportation company across New Jersey. The agents of the company, not finding the consignee, after three or four days, stored the seed and before it was offered to the consignee, it had fallen in price; he refused to receive it, on the ground that it had not been forwarded according to contract, and prosecuted his libel against the vessel, for damages. This case appears to me to be a much stronger one for the state courts, than that of The Rebecca [supra]; yet the learned and experienced judge of that commercial district, in the course of his opinion, says: "The doctrine, that the shipment of goods, or freight, creates an obligation maritime in its character, and which may be enforced, in rem, against the vessel, I shall consider so far settled by our own courts as to furnish the rule of decision in this case;" and he refers to the case of The Rebecca [supra], and also to the cases Maisonnaire v. Keating [Case No. 8,978], and The Volunteer [Id. 16,991], and in 1 Sumn. 595, Append.

The only case cited and supposed to be de-

cided against the jurisdiction in this direct question, is that of Swaim v. The Franklin [supra], as quoted in Thompson v. Lyle, 3 Watts & S. 166. The decision in that case was made by my learned and venerable predecessor, Judge Hopkinson, and, if it had been correctly quoted in that book. I would, without hesitation, follow the precedent of so distinguished a jurist, and consider the law as settled in this district; although opposed to the decision of other learned judges, but which are not of binding authority here. I have, however, examined the record and been furnished with Judge Hopkinson's notes of the argument in that case, and I find it entirely different from what it is supposed to have been. It was somewhat similar to the case of The Lexington. The libellants had shipped a quantity of merchandise in the Franklin, at Philadelphia, to be delivered to certain persons in New Orleans, and intended to be by them forwarded to one Rhea, the ultimate consignee, at Dayton, Ohio; by some mistake, the goods were not delivered at New Orleans to the parties named in the bill of lading, but to another person, who finding the margin of the bill marked "John S. Rhea, Decatur, Ala.," forwarded the goods to Alabama. After several transportations they reached the consignee, Rhea, in Ohio; and it was for the expense of these transportations, and the damage caused by the delay, that the action was commenced. In the course of the argument, the counsel for the respondent admitted that a bill of lading is a maritime contract, and that if the damage had happened at sea the vessel would have been liable, but contended that, inasmuch as she arrived in safety, and the goods were landed at New Orleans, she was not liable for any mistake or error committed on shore.

The learned judge did not decide the question, but said that, as the decision either way would decide nothing finally, and would be only preliminary to carrying the case to the circuit court, he would give a decree, pro forma, in favor of the plea to the jurisdiction, as that would be a final judgment and allow an immediate appeal, while a judgment in favor of the jurisdiction would be followed by a further hearing on the merits, and be attended with delay. No appeal was however taken. See Swaim v. The Franklin [Case No. 13,660]. That case was argued and decided in April, 1838. In October, 1840, that of Van Syckel v. The Thomas Ewing [Id. 16,877], was argued before the same learned judge. It was a libel charging that in March, 1840, the libellant had shipped a quantity of brandy, and other liquors, on board the Ewing, at Philadelphia, to be delivered in good order, the dangers of the sea only excepted, to his consignees at Mobile, and that a large quantity of the said brandy had been wantonly, illegally, and contrary to the contract aforesaid, staved in on deck, and totally destroyed by the master, during the voyage, without any sufficient or legal cause. The answer alleged,

as a justification for the destruction, that it was necessary for the general safety and preservation of the vessel and cargo. The cause was heard on its merits, and in delivering his opinion the judge says: "No objection has been taken, on the part of the respondent, to the jurisdiction of the court, nor to the proceedings, in rem, against the body of the vessel, for compensation for the injury and loss complained of. I shall therefore give no opinion on those points."

Although no direct opinion was given on the question of jurisdiction, I infer, from this, that the leaning of the judge was in favor of it. The case of The Franklin must have been within his recollection, and I do not think he would have undertaken a long and laborious investigation of the merits of the cause, unless, in his opinion, the libel showed the court to have jurisdiction. I am averse to extending the jurisdiction of admiralty courts beyond their well-known and acknowledged limits. I would prefer that all cases of alleged breach of contract should be referred to courts of common law, and to a jury, for determination; but it is more important that courts of different districts, subject to the same laws, should, if possible, have uniformity of decision. It does not seem proper that a person having a claim for the breach of a maritime contract, in one part of the United States, should have a remedy different from, or more advantageous to him, than that of a fellow-citizen in an adjoining state. Therefore, until otherwise directed by superior authority, I shall hold that a claim such as the present is cognisable in the admiralty, and, consequently, the plea of the respondent to the jurisdiction of the court is overruled.

Subsequently, the case came on to be heard, before RANDALL, District Judge, on the merits, and on the 3d May, 1844, he delivered the following opinion:

The libel in this case charges that on or about the first day of October, 1842, the libellant shipped on board the schooner Ninetta, then in the river Rappahannock, forty-three hundred and sixty bushels of wheat, to be carried to, and safely delivered at, the port of Philadelphia; that the libellant at first proposed to ship but two thousand bushels, but was informed by the master that, unless he procured a greater amount of freight, he would be obliged to stop on the voyage and take, beside the said two thousand bushels of wheat, an additional cargo of wood; that the said master contracted and agreed that if the libellant would ship four thousand bushels on board the schooner he would proceed directly to Philadephia, and would not take any additional cargo whatever, and that relying on this agreement he shipped the said forty-three hundred and sixty bushels, being more than the stipulated quantity which was to entitle him to the whole vessel; that the said master, in violation of his contract, did not proceed with

the said cargo directly to the port of Philadelphia, but deviated from his course and went into the river Piankitank, and there took in a deck load of wood, whereby the vessel was overloaded and caused to leak, in consequence whereof the wheat was damaged, injured, and rendered unmarketable, &c. The answer admits the shipment but denies that there was any special contract or agreement, except that set forth in the bill of lading (which is in the usual form), particularly any agreement not to stop if the master saw fit, or it became expedient to do so, or not to take in wood, or any other kind of cargo, if the vessel could conveniently carry it. It denies any deviation from the course of the voyage, and alleges that the schooner was detained at the mouth of the Piankitank by head winds, and while there took in about ten cords of wood as part of a deck load; that the said wood in no way interfered with the safe sailing or navigation of the schooner, or the secure carriage of the wheat, but that after the vessel proceeded to sea she encountered stormy winds and heavy seas, which caused her to leak, whereby the wheat was injured, without any fault, misconduct, or negligence, of the said master; that after the arrival of the vessel at Philadelphia, the wheat was delivered to the consignee, who accepted the same and afterwards refused to pay the freight, for which freight a suit was commenced against him, in the district court for the city and county of Philadelphia, before the filing of this libel.

Thomas A. Ball, a witness who has been examined on the part of the libellant, proves that the libellant had but about two thousand bushels of wheat which he was desirous to ship to Philadelphia, but that on the agreement of the master that if four thousand bushels were shipped he would not take in any other cargo, while if only two thousand bushels were shipped he would be obliged to take in a load of wood to make up his cargo. An agent was sent into the country, and through him the additional quantity required was procured. The evidence on both sides shows that the vessel, after taking the wheat on board, proceeded to the mouth of the Piankitank river, where she took in the wood on deck, and was detained there two days by head winds, then proceeded to Hampton Roads, and waited until the wind was favorable for putting to sea, and then sailed in company with other vessels which had been detained; being a short time out she was met by a gale which caused her to return for repairs; she again started and arrived at Philadelphia, having encountered heavy winds on the passage. When she arrived at Philadelphia, and commenced discharging her cargo, it was for the first time discovered that part of it was damaged. Numerous witnesses have been examined, on the part of the respondent, to prove that the detention at Piankitank river was no disadvantage, inasmuch as the vessel could not have sooner proceeded to sea, and also to prove that it was customary for vessels sailing from the Chesapeake Bay to carry deck-loads of wood, and likewise that the quantity on board the Ninetta would not be likely to injure her sailing or strain her. These appear to be the facts in evidence; without considering the testimony of the pilot, who swears that the stoppage at the Piankitank was unnecessary, that the vessel was in good trim with a fair wind, and that the wood taken on board caused her to draw nearly a foot more water.

It has been contended, on behalf of the respondent, that even if there was an agreement, originally, not to take wood on board, it was subsequently merged in the bill of lading, which, being in writing, cannot be varied or contradicted by parol evidence. I do not think so. The bill of lading is a mere receipt for the goods, and contains no stipulation or liability to which the master would not be subject by the general maritime law. I admit that the burden of proving any other contract or agreement is on the party alleging it, and in this case I think the allegation has been sustained. The usage to carry wood on deck has also been urged as a sufficient defence, but a usage or custom, if proved, cannot be suffered to vary the positive stipulations of a contract. The usage may always be waived at the will of the parties. The Reeside [Case No. 11,657]. The greatest difficulty I have had in this case has been to determine whether this damage was occasioned by the fault or improper conduct of the captain, in putting into the Piankitank; but when I reflect that this was in violation of an express contract with the shipper, who was put to considerable trouble and expense in order to obtain the exclusive use of the vessel, I think the party who violates such a contract, and takes in additional cargo, without the consent of the first shipper, assumes the risk and responsibility of an insurer, and should be liable for any loss that may afterwards occur. But it has been said that these goods were accepted by the consignee, and therefore the respondent is not liable. This, I think, is confounding the liability of the party to pay freight with the liability of the vessel for damage. It is true, that if a consignee accepts goods which arrive in a damaged state he is bound to pay freight, and in England he could not plead the damage by way of set-off, but was put to his separate action to recover it. How far this circuity of action would be encouraged in this country it is unnecessary now to determine, as this is a libel for the very damage sustained, but this disposes of one of the points made by the proctor for the libellant: that the freight was forfeited by the conduct of the master. I do not think so. The libellant seeks to recover what he would

have obtained had the wheat been delivered in a sound state, and must therefore pay what he would have been obliged to pay had it been so delivered.

In giving judgment on the plea to the jurisdiction of the court I intimated that the jurisdiction was sustained on the force of authority which I must always respect, although not absolutely binding on me; the claim in the present case is for an amount sufficient to entitle either party to an appeal to the circuit court, and, as the question is one of great importance to the commercial interests of the community, I trust it will be removed to that tribunal for determination.

The amount of damage ascertained
was ............................. $530 88
From this must be deducted,
 Freight ................... $174 40
 Proceeds of sale.......... 156 87
        ——— 331 27

Leaving ...................... $199 61

Decree for libellant for $199.61, and costs.

An appeal was taken to the circuit court, but has not been prosecuted.